Ragbir v. Homan

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2018

No. 18-1597

RAVIDATH LAWRENCE RAGBIR, NEW SANCTUARY COALITION OF NEW YORK CITY, CASA DE MARYLAND, INC., DETENTION WATCH NETWORK, NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD, NEW YORK IMMIGRATION COALITION,
*Plaintiffs-Appellants*,

*v.*

THOMAS D. HOMAN, in his official capacity as Deputy Director and Senior Official Performing the duties of the Director of U.S. Immigration and Customs Enforcement, THOMAS DECKER, in his official capacity as New York Field Office Director for U.S. Immigration and Customs Enforcement, SCOTT MECHKOWSKI, in his official capacity as Assistant New York Field Office Director for U.S. Immigration and Customs Enforcement, UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, KEVIN K. MCALEENAN, in his official capacity as Acting Secretary of Homeland Security, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, WILLIAM P. BARR, in his official capacity as Attorney General of the United States, UNITED STATES DEPARTMENT OF JUSTICE,
*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of New York.
No. 18-cv-1159 — P. Kevin Castel, *Judge*.

---

ARGUED: OCTOBER 29, 2018
DECIDED: APRIL 25, 2019

Before: WALKER, LEVAL, and DRONEY, *Circuit Judges*.

---

Ravidath Ragbir, an alien subject to a final order of removal, together with several immigration-policy advocacy organizations, appeals from an interlocutory order of the United States District Court for the Southern District of New York (Castel, *J.*) denying their motion for a preliminary injunction and dismissing certain of their claims. Plaintiffs-Appellants sought to enjoin Ragbir's imminent deportation on the basis of evidence that Government officials targeted him for deportation because of his public speech that was critical of Immigration and Customs Enforcement and U.S. immigration policy. The district court held that Ragbir failed to state a cognizable claim to the extent that he sought to enjoin his deportation and that 8 U.S.C. § 1252(g) deprives federal courts of jurisdiction over that claim. We conclude that Ragbir states such a claim, that the Suspension Clause of the Constitution requires the availability of a habeas corpus proceeding in light of § 1252(g), and thus, that the district court had jurisdiction over Ragbir's claim. Accordingly, we **VACATE** the district court's order, and **REMAND** to the district court for further proceedings consistent with this opinion.

Judge WALKER dissents in a separate opinion.

ROBERT STANTON JONES, Arnold & Porter Kaye Scholer LLP, Washington, DC (William C. Perdue, Sally L. Pei, Andrew T. Tutt, Arnold & Porter Kaye Scholer LLP, Washington, DC; Emily Newhouse Dillingham, Arnold & Porter Kaye Scholer LLP, Chicago, IL; Ada Añon, Arnold & Porter Kaye Scholer LLP, New York, NY; Alina Das, Jessica Rofé, Washington Square Legal Services, Inc., New York, NY, *on the brief*) *for Plaintiffs-Appellants.*

STEVEN J. KOCHEVAR, ASSISTANT UNITED STATES ATTORNEY (Benjamin H. Torrance, Assistant United States Attorney, *on the brief*), *for* GEOFFREY S. BERMAN, United States Attorney for the Southern District of New York, *for Defendants-Appellees.*

DRONEY, *Circuit Judge*:

The principal question presented in this appeal is whether Ravidath Ragbir, an alien subject to a valid final order of removal, has presented a legally recognizable claim to enjoin the Government from

deporting him on the basis of his public speech that was critical of the Government's immigration policies and practices. Related to that question is whether Congress has deprived courts of jurisdiction to hear Ragbir's claim,[1] and if so, whether the Suspension Clause of the Constitution, U.S. Const. art. I, § 9, cl. 2, nonetheless requires that the writ of habeas corpus be available to Ragbir.

Ragbir, together with the New Sanctuary Coalition of New York City, CASA de Maryland, Inc., Detention Watch Network, National Immigration Project of the National Lawyers Guild, and New York Immigration Coalition (collectively, "Ragbir"),[2] appeals from an interlocutory order of the district court denying Plaintiffs-

---

[1] By "jurisdiction," we refer to any grant of jurisdiction, including 28 U.S.C. §§ 1331, 2241, and 1651.

[2] It is uncertain whether the organizational plaintiffs would have standing on their own to pursue the claim at issue in this appeal. However, we need not reach that issue because "the issues are sufficiently and adequately presented by" Ragbir, and "nothing is gained or lost" by the presence or absence of the organizational plaintiffs. *Doe v. Bolton*, 410 U.S. 179, 189 (1973); *see also Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 72 n. 16 (1978); *Railway Labor Execs. Ass'n v. U.S.*, 987 F.2d 806, 810 (D.C. Cir. 1993) ("[T]he Supreme Court has repeatedly held that if one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case.").

Appellants' motion for a preliminary injunction and dismissing his claim to the extent that he seeks to "declare unlawful or to enjoin the execution of the final order of removal against him" on the basis of First Amendment retaliation. App'x 281–82. Ragbir claims that certain officials of the Department of Justice and of the Immigration and Customs Enforcement ("ICE") agency of the Department of Homeland Security (collectively, "the Government"), selectively enforced against Ragbir a final order of removal on the basis of his speech that these officials disfavor. The district court concluded that Ragbir failed to state a cognizable claim to the extent that he sought to enjoin his deportation and that 8 U.S.C. § 1252(g) deprives all courts of jurisdiction over that claim.

We conclude that Ragbir states a cognizable constitutional claim, and although Congress intended to strip all courts of jurisdiction over his claim, the Suspension Clause of the Constitution nonetheless requires that Ragbir may bring his challenge through the

writ of habeas corpus.  Accordingly, we vacate the district court's order and remand the case.

## FACTUAL AND PROCEDURAL BACKGROUND

Because the district court dismissed Ragbir's claim (and accordingly denied his motion for a preliminary injunction) for lack of subject matter jurisdiction, we "must accept as true the [plausible] allegations contained in [his] complaint and affidavits for purposes of this appeal."[3] *Filartiga v. Pena-Irala*, 630 F.2d 876, 878 (2d Cir. 1980); *see J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) ("We may consider affidavits and other materials beyond the pleadings to resolve . . . jurisdictional issue[s], but we may not rely on conclusory or hearsay statements contained in the affidavits."); *see also F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 601 (1966) ("Since the case comes to us from a dismissal on jurisdictional grounds we must take

---

[3] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that "the tenet that a court must accept as true all of the [plaintiff's] allegations contained in a complaint" applies only to those allegations that are plausible).

6

the allegations of the Commission's application for a preliminary injunction as true.").

**I.      Ragbir's Immigration Status**

Ragbir, a native and citizen of Trinidad and Tobago, lives in Brooklyn, New York.  He became a lawful permanent resident of the United States in 1994.  His wife is an American citizen, as is their daughter.  In 2001, Ragbir was convicted of wire fraud and conspiracy to commit wire fraud in the United States District Court for the District of New Jersey, and he was sentenced to 30 months' imprisonment. *See generally United States v. Ragbir*, 38 F. App'x 788 (3d Cir. 2002).  His convictions were affirmed by the United States Court of Appeals for the Third Circuit.[4] *Id*.

---

[4] After exhausting the direct appeal of his conviction, Ragbir filed a *coram nobis* petition in the District of New Jersey.  On March 23, 2018, the New Jersey district court stayed Ragbir's administrative immigration removal pending the outcome of Ragbir's petition, finding a likelihood of success on the merits and that the other relevant factors warranted a stay. *See generally Ragbir v. United States*, No. 2:17-cv-1256-KM, 2018 WL 1446407 (D.N.J. Mar. 23, 2018).  The district court denied Ragbir's *coram nobis* petition on January 25, 2019, and the stay of removal in that action expired on February 19, 2019. *Ragbir*, No. 2:17-cv-1256-KM, ECF No. 82.  On January 30, 2019, Ragbir filed in the Third Circuit a notice of appeal of the district

7

After Ragbir served his sentence for his wire fraud convictions, ICE detained him in May 2006. In August 2006, an immigration judge entered an order of removal against him on the basis of those convictions. *See* 8 U.S.C. § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable."). The Bureau of Immigration Affairs ("BIA") denied Ragbir's appeal of his removal order in March 2007. We denied Ragbir's petition for review of the BIA decision in 2010.[5] *Ragbir v. Holder*, 389 F. App'x 80 (2d Cir. 2010). In 2012, the BIA denied Ragbir's motion to reconsider and reopen, and we denied Ragbir's petition for review of that decision in 2016. *Ragbir v. Lynch*, 640 F. App'x 105 (2d Cir. 2016).

---

court's denial of his *coram nobis* petition, *id*., ECF No. 84, and on February 27, 2019, the Third Circuit denied Ragbir's motion to stay his removal pending the resolution of that appeal, *Ragbir v. United* States, No. 19-1282 (3d Cir.).

[5] The Supreme Court denied Ragbir's petition for a writ of *certioriari* as to that appeal.

ICE released Ragbir from its detention in February 2008, having determined that he was not a flight risk. Ragbir has since continued to live in the United States under orders of supervision that authorized him to remain and work in the United States, provided that he complied with his supervision conditions. He also received four administrative stays of removal[6] from ICE: in 2011, 2013, 2014, and 2016.[7] The shortest of those stays was for approximately one

---

[6] Deportation is now described as "removal" in the federal immigration statutes. *Evangelista v. Ashcroft*, 359 F.3d 145, 147 n.1 (2d Cir. 2004). We nonetheless occasionally use the term "deportation" in this opinion as a "well-worn colloquialism[] for . . . 'removal.'" *Id*.

[7] Section 241 of the INA grants the Secretary of Homeland Security authority to stay the removal of an alien if he or she "decides . . . immediate removal is not practicable or proper." 8 U.S.C. § 1231(c)(2)(A); *see Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005) (stating that while the INA refers to the Attorney General as the official to whom Congress delegates authority, this authority now belongs with the Secretary of Homeland Security (citing 6 U.S.C. §§ 251(2), 252(a)(3), 271(b)). 8 C.F.R. § 241.6 implements that authority: "Any request of an alien under a final order of deportation or removal for a stay of deportation or removal shall be filed . . . with the district director having jurisdiction over the place where alien is at the time of filing." § 241.6(a). Any one of certain enumerated officials "in his or her discretion and in consideration of factors listed in 8 CFR § 212.5 and section 241(c) of the Act, may grant a stay of removal or deportation for such time and under such conditions as he or she may deem appropriate." *Id*. Under 8 C.F.R. § 212.5, officials "may require reasonable assurances" that the applicant will make any required appearances and "depart the United States when required to do so." § 212.5(d). "The consideration of all relevant factors includes:" assurances from the

year, while the two most recent stays were for approximately two years each. The most recent stay Ragbir received was scheduled to terminate in January 2018. Ahead of that date, Ragbir filed an application for a fourth renewal of his stay in November 2017.

**II.    Ragbir's Speech**

After his release from immigration detention in 2008, Ragbir became an outspoken activist on immigration issues, including publicly criticizing ICE. The New Sanctuary Coalition of New York City, which he founded, sends volunteers to accompany aliens to court dates and ICE check-in appointments. Ragbir maintained a "regular presence" outside ICE's office and Department of Justice immigration courts in Manhattan, including leading weekly prayer vigils, called "Jericho Walks," with religious faith leaders. App'x 48. Ragbir has received a number of awards for his "zealous advocacy" for immigrants' rights, including from the Episcopal Diocese of Long

applicant sponsor or counsel, "community ties," and "[a]greement to reasonable conditions (such as periodic reporting of whereabouts)." § 212.5(d)(1)-(3).

Island and the New York State Association of Black and Puerto Rican Legislators.  App'x 49.

On March 9, 2017, Ragbir appeared for a scheduled check-in with ICE officials in New York City.  He was accompanied by clergy and elected officials, including a New York State Senator, the New York City Council Speaker, and other New York City Council Members.  At the check-in, ICE New York Field Office Director Thomas Decker confronted Ragbir and attempted to send away the individuals who had accompanied him.  This confrontation garnered negative press coverage for ICE in prominent news outlets, in which Ragbir and several of the politicians who went with him to the check-in expressed criticism of ICE and U.S. immigration policy.[8]

---

[8] *E.g.*, Liz Robbins, *Once Routine, Immigration Check-Ins Are Now High Stakes*, N.Y. Times (Apr. 11, 2017), https://www.nytimes.com/2017/04/11/nyregion/ice-immigration-check-in-deportation.html; Nick Pinto, *Behind ICE's Closed Doors, The Most Un-American Thing I've Seen*, Village Voice (Mar. 10, 2017), https://www.villagevoice.com/2017/03/10/behind-ices-closed-doors-the-most-un-american-thing-ive-seen/.

**III.    The Government's Alleged Retaliation**

Ragbir claims that the events of the March 9, 2017 check-in, including his public statements and the media coverage they garnered, prompted ICE to retaliate against him.  Less than one year after that check-in, on January 3, 2018, and days before Ragbir was scheduled to have his next scheduled administrative check-in, ICE arrested Jean Montrevil, one of the co-founders of Ragbir's New Sanctuary organization, and deported him six days later.

On January 5, 2018, Micah Bucey, a minister in New York City, along with three other faith leaders, had a meeting with ICE's New York Field Office Deputy Director Scott Mechkowski at ICE's office in Manhattan, to discuss Montrevil's case and the clergies' concern that ICE had been surveilling individuals outside a church.  According to Ragbir's complaint and a sworn declaration submitted by Bucey, Mechkowski stated at the meeting, "Nobody gets beat up in the news more than we do, every single day.  It's all over the place, . . . how

we're the Nazi squad, we have no compassion." Mechkowski then stated, "The other day Jean [Montrevil] made some very harsh statements. . . . I'm like, 'Jean, from me to you . . . *you don't want to make matters worse by saying things*." App'x 55, 252 (emphasis added).

Unprompted, Mechkowski then brought up Ragbir, stating, "I read something that Ravi [Ragbir] wrote, [stating] 'do you think it's easy walking around with a target [on you]?'" App'x 253. Mechkowski stated that it "bother[ed]" him that "there isn't anybody in this entire building that doesn't . . . know about Ravi. Everybody knows this case. No matter where you go . . . ." App'x 253. Mechkowski also stated that Ragbir and Montrevil's cases were the two most high-profile cases that ICE had in New York City.

Shortly thereafter, on January 8, 2018—three days before Ragbir was scheduled to appear for his next ICE check-in—Ragbir's counsel Alina Das spoke with Mechkowski, who stated that he felt "resentment" about the events of the March 9, 2017 check-in, that he

13

had heard Ragbir's statements to the press, and that he continued to see Ragbir at protest vigils outside ICE's New York City office. App'x 55–56, 123.

On January 10, 2018, Ragbir's counsel received an email indicating that his November 2017 application for a renewed administrative stay of removal was still pending and no decision had been reached. Ragbir's then-existing stay was set to expire on January 19, 2018. Ragbir's next check-in occurred on January 11, 2018. At the check-in meeting, Mechkowski told Ragbir that officials had decided that morning to deny Ragbir's application for a renewed stay of removal and that ICE would now enforce the removal order against him. Ragbir later learned that his current stay of removal, which was to last eight more days, had been revoked by ICE.

**IV.  Events After the Government's Decision to Execute the Order of Removal**

That same day, ICE detained Ragbir and transferred him to Florida, in preparation for his removal. He was detained in Florida

14

for two weeks. During that period, Ragbir's counsel filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of New York, which the district court granted on January 29, 2018. Ragbir was released that day, but ICE ordered him to check in again on February 10, 2018, and to bring luggage for his removal.

A day before the February 10 check-in was to occur, Ragbir filed this action in the United States District Court for the Southern District of New York. Later that day, the Government stipulated that Ragbir's removal would be stayed pending resolution of his motion for a preliminary injunction, which he filed on February 12, 2018.

Ragbir then brought this action, alleging two First Amendment claims in the district court: one for retaliation against his protected speech and the other for viewpoint discrimination.[9] As relevant to this appeal, Ragbir sought declaratory and injunctive relief to prevent

---

[9] We consider these claims to be materially indistinguishable for our purposes and so, we refer to Ragbir's retaliation "claim" in the singular.

the Government from executing the removal order against him on the basis of his protected speech. He asserted that the district court had federal question jurisdiction under 28 U.S.C. § 1331 and, in the alternative, that it had jurisdiction under the All Writs Act, 28 U.S.C. § 1651, habeas corpus jurisdiction under 28 U.S.C. § 2241, or pursuant to the constitutionally minimum scope of the writ as required by the Suspension Clause of the United States Constitution, U.S. Const. art. I, § 9, cl. 2.

**V.    District Court Proceedings in this Action**

On May 23, 2018, the district court dismissed Ragbir's claim for lack of subject matter jurisdiction insofar as he sought to prevent the Government from executing the final order of removal against him and, accordingly, denied his motion for a preliminary injunction. First, the district court concluded that 8 U.S.C. § 1252 deprives courts of subject matter jurisdiction over all claims challenging the execution

16

of a valid final order of removal, including claims based on the United States Constitution. Section 1252(g) provides:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g) (2012).

The district court determined that Ragbir's claim arose from the Government's decision to "execute [the] removal order[]" against him, *see id.*, and that § 1252(g) deprives courts of jurisdiction over constitutional claims, including those brought under 28 U.S.C. §§ 1331, 2241, or 1651. The district court emphasized that § 1252(g) applies to "*any* cause or claim" and applies "notwithstanding *any* other provision of law (statutory or nonstatutory)," including "any . . . other habeas corpus provision." App'x 269, 275 (quoting § 1252(g))

17

(emphasis in original decision).  Thus, the district court concluded that it lacked subject matter jurisdiction over Ragbir's claim.

The district court further concluded that it could avoid deciding whether § 1252(g)'s withdrawal of jurisdiction posed a Suspension Clause problem as to Ragbir because he did not state a cognizable constitutional claim.  First, the district court applied decisions from this Court which, in its view, foreclosed a First Amendment retaliation claim based on an official's improper motives underlying a criminal arrest or prosecution, provided that the official had probable cause for the arrest or prosecution.

Second, the district court relied on the United States Supreme Court's decision in *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 488 (1999) (henceforth, "*AADC*"), which stated that "[a]s a general matter[,] . . . an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation."  The district court acknowledged the

Supreme Court's statement in *AADC* that it would not "rule out the possibility of a rare case in which the alleged basis of discrimination is so outrageous that the . . . considerations" that generally foreclose a selective enforcement claim "can be overcome." App'x 279 (quoting *AADC*, 525 U.S. at 491). The district court declined, however, to "extend this exception" to Ragbir's claim. App'x 280.

The district court dismissed for lack of jurisdiction Ragbir's claim seeking to enjoin the execution of his removal order and, accordingly, denied his motion for a preliminary injunction.

**VI.   Proceedings in this Court**

Ragbir and the organizational plaintiffs filed a notice of appeal of the district court's decision on May 25, 2018. On June 19, 2018, the district court denied Ragbir's motion for a stay of removal pending his appeal to this Court. On July 19, 2018, in response to Ragbir's motion for a stay of removal filed in this Court, we granted a temporary stay of removal pending oral argument on the motion,

19

which was held on August 14, 2018. We issued an order on August 15, 2018, expediting hearing of this appeal and instructing the parties to notify the Court if the stay issued by the District Court for the District of New Jersey was withdrawn or vacated before we heard the appeal. We heard oral argument on the appeal on October 29, 2018, and on November 1, 2018, we granted Ragbir's motion for a stay of his removal pending the outcome of this appeal.

## APPELLATE JURISDICTION

As the parties agree, we have jurisdiction over this appeal from the district court's interlocutory denial of a preliminary injunction, 28 U.S.C. § 1292(a)(1), and our jurisdiction extends to the district court's dismissal of certain claims because that decision was "inextricably intertwined" with the denial of Ragbir's request for a preliminary injunction and "review of the unappealable issue is . . . necessary for review of the issue over which we have appellate jurisdiction," *Lamar*

*Advertising of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 371-72 (2d Cir. 2004).

**DISCUSSION**

We review *de novo* a district court's dismissal of claims for lack of subject matter jurisdiction. *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996). We review for abuse of discretion a district court's denial of a preliminary injunction. *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018). "A district court abuses its discretion when it rests its decision on . . . an error of law." *Id.*

As an initial matter, Ragbir contends, and the Government does not dispute, that he could not have brought his claim in a BIA proceeding or in a petition for review. That is because Ragbir's claim arose only after his petition process was exhausted and his order of removal became final. [10] Notwithstanding this situation, the

---

[10] A renewed motion to reopen also is not available to Ragbir. Such a motion allows a petitioner to introduce "new facts" pertinent to the propriety of an order of removal. 8 C.F.R. § 1003.2(c)(1). Subject to certain exceptions that are inapplicable here, *see id.* § 1003.2(c)(3), and the possibility in a rare case of equitable

21

Government argues that § 1252(g) withdraws federal court jurisdiction over Ragbir's First Amendment claim. The Government also contends that we need not decide whether the Suspension Clause would nonetheless require the availability of a habeas corpus proceeding because *AADC*, and certain of our decisions, foreclose Ragbir's claim. Ragbir disagrees, contending that he states a claim, that § 1252(g) should be read to allow jurisdiction over his constitutional claim in the district court, and that if § 1252(g) does not so allow, the Suspension Clause requires a review of his claim through a petition for the writ of habeas corpus.

We first consider whether § 1252(g) forecloses all jurisdiction over Ragbir's constitutional claim, which he could not bring in his

tolling, *see, e.g., Zhao v. INS*, 452 F.3d 154, 157 (2d Cir. 2006) (equitably tolling numeric and time limits because of ineffective assistance of counsel during limitations period), "a party may file only one motion to reopen," *id.* § 1003.2(c)(2). Here, even assuming, *arguendo*, that "new facts" as to the Government's alleged retaliatory execution of Ragbir's order of removal in 2018 could bear on the propriety of that order—entered years before the alleged retaliation—Ragbir already filed an unsuccessful motion to reopen (prior to the alleged retaliation). *See generally Ragbir v. Lynch*, 640 F. App'x 105 (2d Cir. 2016).

22

earlier—and concluded—petition for review. We then consider whether Ragbir states a viable constitutional claim. If we answer that question in the affirmative, we must then address whether the Suspension Clause requires a hearing of Ragbir's claim in a habeas corpus proceeding. *See Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g, P.C.,* 467 U.S. 138, 158 (1984) ("It is a fundamental rule of judicial restraint . . . [that courts] will not reach constitutional questions in advance of the necessity of deciding them.").

**I.** **Whether § 1252(g) Forecloses Jurisdiction Over Ragbir's Claim**

The crux of the dispute between Ragbir and the Government is whether § 1252(g) applies: 1) to the Government's alleged conduct here; and 2) to constitutional claims.

**A. Section 1252(g) Applies to the Alleged Government Conduct**

The Supreme Court has emphasized that § 1252(g) "applies only to three discrete actions:" the Government's "'decision or action'

23

to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'"[11] *AADC*, 525 U.S. at 482 (quoting § 1252(g)) (emphasis in original decision). By contrast, § 1252(g) does not apply to "many other decisions or actions that may be part of the deportation process—such as the decisions to open an investigation." *Id.*

The Government argues that Ragbir's claim falls within the ambit of § 1252(g) because his claim arises from the Government's execution of Ragbir's final removal order. Ragbir disagrees, contending that his claim instead arises "from immigration officials' unlawful decision to retaliate against [his] protected speech." Appellants' Br. at 31–32.

In support, Ragbir refers to a Ninth Circuit case, *Arce v. United States*, 899 F.3d 796 (9th Cir. 2018). In *Arce*, the Government's

---

[11] *AADC* addressed the version of § 1252(g) as it was first enacted in 1996. As is discussed later in this opinion, § 1252(g) has since been amended by the REAL ID Act of 2005, but the statutory text regarding the three discrete Government actions has not changed.

24

violation of a judicial stay of removal resulted in the alien's wrongful removal from the United States. *Id*. at 799. The alien plaintiff brought a Federal Tort Claims Act ("FTCA") claim for damages suffered as result of the removal. The Ninth Circuit held that this claim fell outside the scope of § 1252(g) because "the stay of removal temporarily suspend[ed] the source of the [Government's] authority to act." *Id*. at 800 (internal quotations omitted). In other words, while the stay was in place, the Government "totally lack[ed] the [statutory] discretion to effectuate a removal order." *Id*. at 800–01. Therefore, the Ninth Circuit concluded that the Government's "decision or action to violate a court order staying removal f[ell] outside" of § 1252(g)'s "jurisdiction-stripping reach." *Id*. at 801.

We express no opinion as to the Ninth Circuit's decision in *Arce*, which is distinguishable from this case.[12] Here, the Government

---

[12] We note that the Eighth Circuit appears to have come to a different conclusion than the Ninth Circuit. *Silva v. United States*, 866 F.3d 938, 940 (8th Cir. 2017) (holding that a claim challenging the execution of a removal order in violation of a stay still fell within § 1252(g)).

unquestionably had statutory authority to execute Ragbir's final order of removal, and that very conduct is the retaliation about which Ragbir complains.[13] To remove that decision from the scope of section 1252(g) because it was allegedly made based on unlawful considerations would allow plaintiffs to bypass § 1252(g) through mere styling of their claims. And so, we conclude that the Government's challenged conduct falls squarely within the ostensible jurisdictional limitation of § 1252(g).

**B. Section 1252(g) Applies to Constitutional Claims**

Next, Ragbir argues that Congress would have used the word "constitutional" in § 1252(g) if it intended to foreclose jurisdiction (habeas or otherwise) over those claims. Moreover, he contends that § 1252(g) merely "channels" claims that *could* be brought in a petition

---

[13] That discrete action necessarily includes the Government's denial of a further administrative stay of removal in January 2018 and its early termination of Ragbir's then-existing stay. *See AADC*, 525 U.S. at 483 (describing the Executive's discretion to abandon the execution of a removal order as part of the execution "stage" in the deportation process).

for review into that process, but does not eliminate jurisdiction over other claims. The Government argues that § 1252(g) plainly states otherwise.

Before proceeding to the current text of § 1252(g), a brief review of the history of that provision—including court decisions construing it—is instructive. Section 1252(g) was added to the Immigration and Nationality Act ("INA") through adoption of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") in 1996. The initial version of § 1252(g) read as follows:

> Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.

8 U.S.C. § 1252(g) (2000).

In *Jean-Baptiste v. Reno*, 144 F.3d 212, 218–20 (2d Cir. 1998), we held that the 1996 version of § 1252(g) barred federal court jurisdiction

27

under 28 U.S.C. § 1331 over constitutional claims within its scope—there, the plaintiffs' Fifth Amendment due process claim challenging the INS's deportation procedures. We dismissed the plaintiffs' claim for lack of subject matter jurisdiction under § 1331. *Id*. However, we held that "in the absence of language affirmatively and clearly eliminating habeas review," § 1252(g) did not repeal habeas corpus jurisdiction under 28 U.S.C. § 2241. *Id*. at 219–20. Other circuit courts, and, eventually, the Supreme Court, also concluded that neither IIRIRA nor the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") repealed (or limited the prior scope of) district court jurisdiction over aliens' petitions for writs of habeas corpus brought pursuant to 28 U.S.C. § 2241. *See I.N.S. v. St. Cyr*, 533 U.S. 289, 314 (2001).

Congress responded to the Supreme Court's *St. Cyr* decision by enacting the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat 302,

which strengthened § 1252(g)'s jurisdictional limitations. [14]

Specifically, it amended § 1252(g) by inserting new language, which is italicized:

> Except as provided in this section and notwithstanding any other provision of law *(statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title*, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.

8 U.S.C. § 1252(g) (2012) (emphasis added).

Thus, the REAL ID Act had two primary functions as to section 1252(g). First, by adding unmistakably clear language, it "eliminat[ed] the availability of habeas corpus relief in the United States District Courts for aliens seeking to challenge orders of removal entered against them." *Ruiz-Martinez v. Mukasey*, 516 F.3d 102, 105 (2d Cir. 2008).

---

[14] *See* Paul Diller, Habeas and (Non-)Delegation, 77 U. Chi. L. Rev. 585, 615 (2010) (stating that Congress passed the REAL ID Act in direct response to *St. Cyr*).

Second, we conclude that by adding the words "statutory or nonstatutory," Congress further clarified what had already been our construction of § 1252(g) in *Jean-Baptiste*: it applies even to constitutional claims. Taken together with § 1252(g)'s clear elimination of habeas corpus jurisdiction, it follows that the statute purports to forbid bringing even constitutional claims in such a proceeding. In reaching the conclusion that the amended version of § 1252(g) should be so construed, we are mindful that "[w]here Congress intends to preclude judicial review of constitutional claims[,] its intent to do so must be clear," *Webster v. Doe*, 486 U.S. 592, 603 (1988), and that "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly possible, we are obligated to construe the statute to avoid such problems," *St. Cyr*, 533 U.S. at 299–300 (citing *Crowell v. Benson*, 285 U.S. 22, 62 (1932)) (internal citation and quotation marks omitted). However, "[t]he

canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as *a means of choosing between them.*" *Clark v. Martinez*, 543 U.S. 371, 385 (2005) (emphasis in original); *see Boumediene v. Bush*, 553 U.S. 723, 787 (2008) (stating that "[t]he canon of constitutional avoidance does not supplant traditional modes of statutory interpretation" (citing *Clark*, 543 U.S. at 385)). In other words, "[w]e cannot" use constitutional avoidance to "ignore the text and purpose of a statute in order to save it." *Boumediene*, 553 U.S. at 787.

Here, even putting aside our construction of the *less* obviously restrictive version of 1252(g) in *Jean-Baptiste*, we are aware of no "nonstatutory" claim that a petitioner could bring in relation to a deportation proceeding other than one rooted in the Constitution. Nor does Ragbir offer such an explanation. And even if there were such claims, we see no basis—in light of the text and legislative

history—for construing the word "nonstatutory" in § 1252(g) to *exclude* constitutional claims. [15, 16]

Accordingly, Congress appears to have made "an informed legislative choice" that eliminating even habeas review of constitutional claims would not pose a constitutional (Suspension Clause) problem despite courts' indications to the contrary, and so Congress's legislative "intent must be respected even if a difficult constitutional question is presented." *Boumediene*, 553 U.S. at 738 (recognizing that Congress's passage of the Military Commissions Act of 2006 was a direct response to the Court's narrow reading of the Detainee Treatment Act in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006)). It then falls upon "the Judiciary, in light of [Congress's]

---

[15] For the same reasons, we also reject Ragbir's argument that § 1252(g) merely "channels" certain claims into a petition for review but does not intend to eliminate jurisdiction for other claims. That argument lacks textual support and is belied by Congress's plain indication, through the REAL ID Act, that § 1252(g)'s limitation of "any" cause or claim truly means "any."

[16] The Eighth and Sixth Circuits have come to the same conclusion. *Silva*, 866 F.3d at 941; *Elgharib v. Napolitano*, 600 F.3d 597, 602 (6th Cir. 2010).

determination" that such statutory language is constitutional, to "proceed[] to its own independent judgment on the constitutional question when required to do so in a proper case." *Id*.

**II.     Whether Ragbir States a Constitutional Claim**

As discussed above, Ragbir argues that even if § 1252 bars all jurisdiction over his claim, the Suspension Clause nonetheless requires the availability of a petition for writ of habeas corpus. The Government counters that we need not reach that serious constitutional question because Ragbir fails to state a cognizable claim under certain of our decisions and because of the application of the Supreme Court's holding in *AADC*. We thus first address whether Ragbir states a claim.

**A. Whether Our Prior Decisions Foreclose Ragbir's Claim**

To state a First Amendment retaliation claim, a plaintiff must show that: "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by

33

[the plaintiff's] exercise of that right; and (3) the defendant's actions caused [the plaintiff] some injury." *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (quoting *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013)). The Government contends that we have "long held" that the existence of probable cause to arrest an individual defeats a plaintiff's First Amendment retaliation claim. Gov't Br. at 39. And so, the Government argues that, *per force*, Ragbir's undisputedly valid final order of removal bars his claim that Government officials sought to deport him in retaliation for his speech.

Even if we were to accept the Government's analogy of that aspect of Fourth Amendment law to the execution of final orders of removal,[17] it reads our decisions too broadly. The Government relies

---

[17] It is unclear that Fourth Amendment doctrine should be so readily applied to the circumstances here, as it has developed within the context of the particular interests served by criminal investigations. *See, e.g.*, *Virginia v. Moore*, 553 U.S. 164, 173 (2008) ("[A]n arrest based on probable cause serves interests that have long been seen as sufficient to justify the seizure. Arrest ensures that a suspect appears to answer charges and does not continue a crime, and it safeguards evidence and enables officers to conduct an in-custody investigation." (internal citations omitted)).

primarily on *Mozzochi v. Borden*, 959 F.2d 1174, 1179–80 (2d Cir. 1992), and *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995), which relied on *Mozzochi* for its legal standard. But, in *Mozzochi* the question presented was whether it was "clearly established that an individual's constitutional rights were violated when a criminal prosecution, supported by probable cause, was initiated in an attempt to deter or silence the exercise by the criminal defendant of his right to free speech, *but without the effect of actually deterring or silencing the individual.*" *Mozzochi*, 959 F.2d at 1179 (emphasis added). Central to our decision in favor of the defendants was that, at summary judgment, Mozzochi had not adduced "any evidence to support his allegation that he was actually chilled in the exercise of the right to free speech." *Id*. at 1179–80. Thus, *Mozzochi* stands for the proposition that "[a]n individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause that is in reality an unsuccessful attempt to deter or

silence criticism of the government." *Id*. at 1180. In *Singer*, we quoted that holding from *Mozzochi* and affirmed the dismissal of Singer's First Amendment retaliation claim because, *inter alia*, he had "failed to allege with sufficient particularity any actual 'chilling' of his speech."[18, 19] *Id*. at 120.

The Government does not argue that Ragbir has made an insufficient showing that his speech has been or will be suppressed, and so we deem that argument waived. Nor, at any rate, do we doubt that Ragbir has made the requisite showing. We thus conclude that

[18] The Government also disputes Ragbir's contention that the Supreme Court's decision in *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018), has broadened the scope of potential retaliatory arrest claims that are permissible under our precedents. However, we need not reach that issue for the reasons discussed above.

[19] The Government cites in passing to another of our decisions that quoted the same standard from *Mozzochi*, and so, it is unpersuasive for the Government's purposes. *Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012). Likewise, *Magnotti v. Kuntz*, 918 F.2d 364, 368 (2d Cir. 1990), is unhelpful to the Government. In *Magnotti*, we stated that it was "undisputed that retaliatory prosecution may expose a state official" to damages. *Id*. The plaintiff, Magnotti, claimed that charges were brought against him in retaliation for his complaints of police misconduct. *Id*. We held against Magnotti at summary judgment, however, because, *inter alia*, the only evidence he had adduced of the retaliation was "omissions made in the warrant application." *Id*.

the precedents cited by the Government do not foreclose Ragbir's claim.

**B. Whether *AADC* Forecloses Ragbir's claim**

The Government also argues that the Supreme Court's decision in *AADC* forecloses Ragbir's claim. In *AADC*, six temporary resident aliens and two lawful permanent resident aliens brought a First Amendment claim seeking to enjoin the Government's initiation of deportation proceedings against them. *AADC*, 525 U.S. at 474. The six temporary residents were charged with technical immigration violations such as overstaying visas, and the two resident-alien plaintiffs were charged with aiding a terrorist organization.[20] *Id*. at 473–74.

The regional counsel of ICE's predecessor agency, the Immigration and Naturalization Service ("INS"), had stated at a press conference that the INS was seeking to deport the plaintiffs because

---

[20] The INS had also brought against all the aliens "advocacy-of-communism charges," which were later dropped. *AADC*, 525 U.S. at 473–74.

37

of their affiliation with the Popular Front for the Liberation of Palestine ("PFLP"), a "group that the Government characterize[d] as an international terrorist and communist organization." *Id*. at 473. The Government represented that it had evidence that the PFLP had been responsible for multiple terrorist attacks around the world. Brief for the Petitioners, *AADC*, 525 U.S. 471 (1998) No. 97-1252, 1998 WL 411431 at *2–4.

The plaintiffs brought an action in the district court, claiming that the Government's initiation of deportation proceedings impinged upon their right to associate under the First Amendment. They did not wish to wait to bring their claims until a final order of removal (if any) was entered against them because deportation proceedings could take years, and during that time their association with the PFLP would be deterred. *AADC*, 525 U.S. at 487–88; Brief for Respondents ("Plaintiffs' *AADC* Br."), *AADC*, 525 U.S. 471 (1998) No. 97-1252, 1998 WL 614300 at *30–37. In addition, the plaintiffs argued

38

that their claims required factual development that could not be accomplished in an administrative immigration proceeding. Plaintiffs' *AADC* Br. at *14–15, 20–21. The plaintiffs thus urged the Supreme Court to employ the doctrine of constitutional avoidance to read the pre-REAL ID Act version of § 1252(g) as permitting immediate district court review of their constitutional claims. *AADC*, 525 U.S. at 487–88.

The Supreme Court held that § 1252(g) permissibly deprived courts of jurisdiction over the plaintiffs' claims. *Id*. The Court stated that "[a]s a general matter—and assuredly in the context of claims such as those put forward in the present case—an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation." *Id*.

The Court also expressed concern that the plaintiffs' claims "invade[d] a special province of the Executive—its prosecutorial discretion." *Id*. at 489. The Court was particularly concerned about

reviewing the Executive's national-security and foreign-affairs decisionmaking:

> What will be involved in deportation cases is not merely the disclosure of normal domestic law enforcement priorities and techniques, but often the disclosure of foreign-policy objectives and (as in this case) foreign-intelligence products and techniques. The Executive should not have to disclose its 'real' reasons for deeming nationals of a particular country a special threat—or indeed for simply wishing to antagonize a particular foreign country by focusing on that country's nationals—and even if it did disclose them a court would be ill equipped to determine their authenticity and utterly unable to assess their adequacy.

*Id*. at 490-91. The Court further stated that "the consideration on the other side of the ledger in deportation cases—the interest of the target in avoiding 'selective' treatment—is less compelling than in criminal prosecutions." *Id*. at 491. The Court explained:

> While the consequences of deportation may assuredly be grave, they are not imposed as a punishment. In many cases (for six of the eight aliens here) deportation is sought simply because the time of permitted residence in this country has expired, or the activity for which residence was permitted has been completed. Even when deportation is sought because of some act the alien

40

has committed, in principle the alien is not being punished for that act (criminal charges may be available for that separate purpose) but is merely being held to the terms under which he was admitted.

*Id*. (internal citation omitted).

The Court continued, "[a]nd in all cases, deportation is necessary in order to bring to an end *an ongoing violation* of United States law. The contention that a violation must be allowed to continue because it has been improperly selected is not powerfully appealing." *Id*. (emphasis in original).

Especially important for the situation that faces us, the Court declined to "rule out the possibility of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome. Whether or not there be such exceptions, . . . [w]hen an alien's continuing presence in this country is in violation of the immigration laws, the Government does not offend the Constitution by deporting him for the additional reason

41

that it believes him to be a member of an organization that supports terrorist activity."[21]  *Id*. at 491–92.

Ragbir's situation is very different from the one presented in *AADC*.  Although the Supreme Court did not clarify what might constitute an "outrageous" basis for discrimination, *AADC* compels courts to evaluate the gravity of the constitutional right affected; the extent to which the plaintiff's conduct or status that forms the basis for the alleged discrimination is actually protected; the egregiousness of the Government's alleged conduct; and the plaintiff's interest in avoiding selective treatment, as balanced against the Government's discretionary prerogative.  We address these considerations in turn and conclude that Ragbir's claim involves "outrageous" conduct.

---

[21] *See also Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008) (agreeing, in the context of considering a Fifth Amendment equal protection claim, that a selective prosecution based on animus could be "outrageous" under *AADC*).

**1. Ragbir's Speech Implicates the Highest Position in the Hierarchy of First Amendment Protection**

First Amendment speech is preeminent among the liberties that the Constitution protects. Indeed, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics . . . or other matters of opinion." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018) (quoting *West Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

Ragbir's speech implicates the apex of protection under the First Amendment. His advocacy for reform of immigration policies and practices is at the heart of current political debate among American citizens and other residents. Thus, Ragbir's speech on a matter of "public concern"[22] is at "the heart of . . . First Amendment[]

---

[22] "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (quoting *Connick*, 461 U.S. at 146), "or when it 'is a subject of legitimate news interest; that is, a subject of general interest

protection,"[23] and "occupies the highest rung of the hierarchy of First Amendment values,'" *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985)). Because Ragbir's speech concerns "political change," it is also "core political speech" and thus "trenches upon an area in which the importance of First Amendment protections *is at its zenith*." *Meyer v. Grant*, 486 U.S. 414, 421–22, 425 (1988) (emphasis added and internal quotation marks omitted). Indeed, his "speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991).

---

and of value and concern to the public,'" *id.* (quoting *San Diego v. Roe,* 543 U.S. 77, 83–84 (2004)).

[23] *See Snyder*, 562 U.S. at 452 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964)) ("The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.").

**2.  The Government's Alleged Retaliation Was Egregious**

"It is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys." *Matal v. Tam*, 137 S. Ct. 1744, 1765 (2017).  "Such discriminat[ion] based on viewpoint is an 'egregious form of content discrimination,' which is 'presumptively unconstitutional.'"[24]  *Id*. at 1766 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995)).  The Supreme Court has further described viewpoint discrimination as a "blatant" "violation of the First Amendment."  *Rosenberger*, 515 U.S. at 829.

Ragbir's plausible allegations and evidence, which we must accept as true at this juncture, support that the Government singled him out for deportation based not only on the viewpoint of his

---

[24] "At its most basic, the test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal*, 137 S. Ct. at 1766.

political speech, but on the public attention it received. In a declaration by Micah Bucey, a New York City minister, Bucey asserts that ICE's New York City Field Office Director, Scott Mechkowski, stated that Ragbir and Jean Montrevil were ICE's two most prominent cases in New York City and complained that the activists' protests and comments to the press negatively portrayed ICE to the public and to others in the Government. According to Bucey, Mechkowski stated: "Nobody gets beat up in the news more than we do, every single day. It's all over the place, . . . how we're the Nazi squad, we have no compassion." App'x 252. Mechkowski then stated that he had heard Ragbir's New Sanctuary cofounder Montrevil (whom ICE had also just detained) "ma[ke] some very harsh statements. I'm like, 'Jean, from me to you . . . *you don't want to make matters worse by saying things*." App'x 252 (emphasis added). Mechkowski then turned to Ragbir specifically, stating that it "bother[ed]" him that "there isn't anybody in this entire building that doesn't . . . know about Ravi."

App'x 253. "Everybody knows this case," Mechkowski stated, "[n]o matter where you go." App'x 253. Ragbir's counsel Alina Das also submitted a declaration stating that she spoke with Mechkowski, who expressed "resentment" about the events of the March 9, 2017 check-in and disapprovingly mentioned that he had heard Ragbir's statements to the press. App'x 55–56, 123.

A plausible, clear inference is drawn that Ragbir's public expression of his criticism, and its prominence, played a significant role in the recent attempts to remove him. The conclusion that ICE would nonetheless still be free to deport Ragbir on the basis of his advocacy would certainly draw considerable media attention and thus would be a particularly effective deterrent to other aliens who would also challenge the agency and its immigration policies. Ragbir's allegations and evidence support that certain officials were

47

well aware of that consequence.[25] To allow this retaliatory conduct to proceed would broadly chill protected speech, among not only activists subject to final orders of deportation but also those citizens and other residents who would fear retaliation against others. In short, the Government's alleged conduct plausibly fits within the "outrageous[ness]" exception to *AADC*.

### 3. The Alien's Interest in Avoiding Selective Deportation

The Supreme Court stated in *AADC* that, "[w]hile the consequences of deportation may assuredly be grave, they are not imposed as a punishment." *AADC*, 525 U.S. at 491. That premise supported the Supreme Court's conclusion that, by comparison to those detained for crimes (who may bring selective-enforcement claims in certain limited circumstances), the *AADC* aliens had a diminished liberty interest in preventing their deportation. *Id*.

---

[25] It is unclear whether Ragbir plausibly states a claim against *all* the named Defendants. However, neither party has briefed that issue, and so we decline to address it.

However, after *AADC*, the Supreme Court reiterated in *Padilla v. Kentucky*, 559 U.S. 356 (2010), its longstanding recognition that deportation is indeed a punishment for lawful permanent residents who, like Ragbir, are rendered removable because of a criminal conviction:

> We have long recognized that deportation is a particularly severe "penalty," *Fong Yue Ting v. United States*, 149 U.S. 698, 740 (1893); but it is not, in a strict sense, a criminal sanction. Although removal proceedings are civil in nature, deportation is nevertheless intimately related to the criminal process. Our law has enmeshed criminal convictions and the penalty of deportation for nearly a century. And, importantly, recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders. Thus, we find it "most difficult" to divorce the penalty from the conviction in the deportation context. *United States v. Russell*, 686 F.2d 35, 38 (C.A.D.C. 1982). Moreover, we are quite confident that noncitizen defendants facing a risk of deportation for a particular offense find it even more difficult.

*Id*. at 365–66 (some internal citations omitted).[26] The premise that deportation of lawful permanent residents convicted of crimes is punitive was important to the Court's holding in *Padilla*: deportation of the petitioner was so "close[ly] connect[ed]" to the criminal process that the analysis that applies to claims of ineffective assistance of counsel applied to his claim. *Id*. at 366. Thus, *Padilla* supports that Ragbir has a substantial interest in avoiding deportation based on his speech.

**4. The Government's Discretionary Prerogative**

Finally, the Government's interest in having unchallenged discretion to deport Ragbir is also less substantial than in *AADC*. First, as discussed above, national-security and foreign-policy concerns about terrorism were primary in *AADC*, and the Court

---

[26] *See also Bridges v. Wixon*, 326 U.S. 135, 147 (1945) ("[I]t must be remembered that although deportation technically is not criminal punishment, it may nevertheless visit as great a hardship as the deprivation of the right to pursue a vocation or a calling.") (internal citations omitted); *Lok v. INS*, 548 F.2d 37, 39 (2d Cir. 1977) ("Deportation is a sanction which . . . surpasses all but the most Draconian criminal penalties.").

expressed misgivings that a court proceeding allowing inquiry into the "real reasons" why the Government sought to deport the PFLP supporters would compromise intelligence sources and foreign relations. *AADC*, 525 U.S. at 491. The Government makes no such argument in this case. Here, the plaintiff's plausible allegation is that the Government undertook the deportation to silence criticism of the responsible agency.

We recognize that in *AADC* the Supreme Court observed, "[I]n all cases, deportation is necessary . . . to bring to an end an ongoing violation of United States law." *Id.* (emphasis removed). That was certainly correct with respect to aliens who have entered the country illegally or have overstayed their visas. However, the circumstance is different for a former lawful permanent resident, such as Ragbir, who has become "deportable." *See* 8 U.S.C. § 1227(a)(2)(A)(iii). While such a person is subject to removal at any time, his presence in the United States while awaiting deportation violates no law. He is under

51

no legal obligation to depart prior to deportation. And, the law imposes no criminal or civil penalties on that person for failing to leave. *See* Gerard L. Neuman, Terrorism, Selective Deportation and the First Amendment After Reno v. AADC, 14 Geo. Immigr. L.J. 313, 342 (2000) ("Permanent residents who become deportable are *not* engaged in an ongoing violation of United States law. The INA . . . creates no obligations for the aliens to depart without being asked, and imposes no other sanction on permanent residents for becoming deportable. If the [Government] do[es] not . . . seek deportation, then the alien is committing no wrong by continuing residence in the United States."). Indeed, in Ragbir's case, his continued presence after his removal order became final was expressly sanctioned by successive stay orders and work permits. Thus, while it is indisputable that the Government retains an interest in enforcing the immigration laws by removing a deportable person, Ragbir's continued presence until deported has not violated any U.S. law. The

52

Government's interest in deporting him is lower than in the case of an alien whose presence is illegal and in the cases of aliens who, as in *AADC*, pose a threat to safety and security.

* * *

We acknowledge that judicial review of deportation proceedings has produced concern about the Executive's prerogative to execute immigration law. The Government's argument that a holding in Ragbir's favor would open the flood gates of litigation deserves significant consideration. Accordingly, we do not delineate the boundaries of what constitutes an "outrageous" claim within the meaning of *AADC*. It suffices to say that, here, Ragbir's speech implicates the highest protection of the First Amendment, he has adduced plausible—indeed, strong—evidence that officials responsible for the decision to deport him did so based on their disfavor of Ragbir's speech (and its prominence), Ragbir has a substantial interest in avoiding deportation under these

circumstances, and the Government's interests in avoiding any inquiry into its conduct are less pronounced than in *AADC*. In these circumstances, the basis for the alleged discrimination against Ragbir qualifies as "outrageous" under *AADC*.

### III. Whether Ragbir is Entitled to the Privilege of the Writ of Habeas Corpus

Because Ragbir states a cognizable claim but, through its adoption of § 1252(g), Congress foreclosed all grants of jurisdiction, we must decide whether the Suspension Clause nonetheless entitles Ragbir to the constitutionally mandated minimum scope of the privilege of the writ of habeas corpus. The Suspension Clause of the Constitution states, "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *St. Cyr*, 533 U.S. at 301.

These protections extend fully to aliens subject to an order of removal. *Id.*; *see also* Gerard L. Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961, 1044 (1998) ("[H]istorical precedents beginning shortly after 1787 and reaching to the present confirm the applicability of the writ of habeas corpus to the detention involved in the physical removal of aliens from the United States. These precedents include opinions . . . denying the power of Congress to eliminate judicial inquiry.").

Thus, except in periods of "formal suspension" of the writ, alien petitioners in "Executive custody," *Boumediene*, 553 U.S. at 745, must either be given access to an "adequate substitute" to the writ (such as a petition for review), *see St. Cyr*, 533 U.S. at 305, or the writ itself, so as "to maintain the 'delicate balance of governance' that is itself the surest safeguard of liberty," *Boumediene*, 553 U.S. at 745 (quoting *Hamdi*, 542 U.S. at 536 (plurality opinion)).

The Suspension Clause does not require the availability of the writ as codified under section 2241, or any other statute, *per se*. Rather, the Suspension Clause protects the constitutional "minimum" scope of the writ, upon which Congress may expand through statute. *See Boumediene*, 553 U.S. at 746; *St. Cyr*, 533 U.S. at 301. As to what that "minimum" entails, "[t]he [Supreme] Court has been careful not to foreclose the possibility that the protections of the Suspension Clause have expanded along with post–1789 developments that define the present scope of the writ." *Boumediene*, 553 U.S. at 746 (citing *St. Cyr*, 533 U.S. at 300–01). "But the analysis" of the minimum scope of the writ protected by the Suspension Clause "may begin with precedents as of 1789, . . . when the Constitution was drafted and ratified." *Id*.

The Government does not contest these basic premises, nor do the parties dispute that Ragbir has no "adequate substitute" for a

habeas petition.[27]  Rather, the Government argues that Ragbir is not entitled to the constitutional minimum scope of the writ because, in its view:  1) Ragbir does not seek release from custody since he does not challenge his final order of removal; and 2) Ragbir is not in the Government's custody at all.

In addition, the Government suggests in passing that Ragbir is not entitled to the constitutional minimum scope of habeas review because the merits issues in this case are not purely legal, but rather require factfinding.  Although we might normally deem that issue

---

[27] In a Federal Rule of Appellate Procedure 28(j) letter, the  Government brings to our attention the Sixth Circuit's recent decision in *Hamama v. Adducci*, 912 F.3d 869 (6th Cir. 2018).  In *Hamama*, the Sixth Circuit concluded that § 1252(g) divested the district courts of subject matter jurisdiction over the claims of the plaintiff Iraqi nationals, who sought stays of their removal, but that the plaintiffs had available an "adequate alternative" to habeas relief in the form of a "motion to reopen followed by a petition for review."  *Id*. at 876.  As discussed above, the Government did not dispute in its response brief (in this appeal) Ragbir's contention that no "adequate substitute" to a habeas proceeding was available to him.  By contrast to *Hamama*, and as we discussed earlier in this opinion, *see supra* n. 10 and accompanying text, Ragbir's constitutional claims arose only after his removal order became final and after he had taken full advantage of the review process prescribed by statute, including filing a petition for review and the one motion to reopen to which he was entitled.  We thus conclude that the "adequate substitute" that the *Hamama* court found present in that case is not available to Ragbir.

waived for failure to develop it, we consider the issue because it bears on the district court's authority and means to adjudicate Ragbir's habeas petition.

**A. Habeas Relief Would Alter Ragbir's Situation**

The Government argues that Ragbir is not entitled to the writ because he does not challenge his final order of removal, and so, it contends, the writ would leave him "in precisely the same position as he is now." Gov't Br. at 44–45. That is incorrect; the Government assumes that a habeas court's only option would be to invalidate Ragbir's final order of removal, but habeas relief would of course prevent the Government from deporting him for its duration. And courts are "invested with the largest power to control and direct the form of judgment to be entered in cases brought up before [them] on habeas corpus.'" *U.S. ex rel. D'Amico v. Bishopp*, 286 F.2d 320, 322 (2d Cir. 1961) (quoting *In re Bonner*, 151 U.S. 242, 261 (1894)); *see Harris v. Nelson*, 394 U.S. 286, 290–92 (1969) ("The very nature of the writ

demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected."). Thus, a habeas court has the authority to grant relief that would alter Ragbir's situation.

**B. Ragbir is in Executive Custody**

We also disagree with the Government's argument that Ragbir is not in custody. The "custody requirement" of habeas corpus "is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty. . . . [I]ts use has been limited to cases of special urgency" that are "severe" and "immediate."[28] *Hensley v. Mun. Court, San Jose Milpitas Judicial Dist.*, 411 U.S. 345, 351 (1973). In *Hensley*, the Supreme Court held that an individual released on his

---

[28] The Supreme Court has stated that 8 U.S.C. § 2241 incorporates the common-law habeas requirement that the petitioner be in "custody" and "does not attempt to mark the boundaries of 'custody' nor in any way other than by use of that word attempt to limit the situations in which the writ can be used." *Jones v. Cunningham*, 371 U.S. 236, 238 (1963). And so, for purposes of determining the constitutional meaning of the custody requirement, we look to the common law and to authority interpreting § 2241.

own recognizance from state detention remained in the state's custody. *Id*. The Court noted that it had "consistently rejected interpretations of the habeas corpus statute that would suffocate the writ in stifling formalisms or hobble its effectiveness with the manacles of arcane and scholastic procedural requirements. . . . That same theme has indelibly marked our construction of the . . . custody requirement." *Id*. at 350.

Two primary considerations drove the Court's conclusion in *Hensley*. First, the petitioner was "subject to restraints not shared by the public generally" because "[h]is freedom of movement rest[ed] in the hands of state judicial officers, who may demand his presence at any time and without a moment's notice." *Id*. at 351 (quoting *Jones v. Cunningham*, 371 U.S. 236, 240 (1963)) (internal quotation marks omitted). Second, the petitioner "remain[ed] at large only by the grace of a stay entered first by the state trial court and then extended

by two Justices of [the Supreme] Court." *Id.* The Court went on to explain:

> The State has emphatically indicated its determination to put him behind bars, and the State has taken every possible step to secure that result. His incarceration is not, in other words, a speculative possibility that depends on a number of contingencies over which he has no control. This is not a case where the unfolding of events may render the entire controversy academic. The petitioner has been forced to fend off the state authorities by means of a stay, and those authorities retain the determination and the power to seize him as soon as the obstacle of the stay is removed. The need to keep the stay in force is itself an unusual and substantial impairment of his liberty.

*Id*. at 351–52.

The Court rejected the Government's argument that habeas relief would be available only when the Government again physically detained the individual. "[W]e would badly serve the purposes and the history of the writ," the Court stated, "to hold that under these circumstances the petitioner's failure to spend even 10 minutes in jail is enough to deprive the District Court of power to hear his

constitutional claim." *Id*. at 353. In the same term it decided *Hensley*, the Court stated even more directly that "the writ is available . . . to attack future confinement and obtain future releases." *Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973).

The similarity of Ragbir's situation to that of the petitioner in *Hensley* is clear. If Ragbir were currently in the Government's physical confinement or had already been deported, that Ragbir would be in custody is obvious.[29] But that he has not been deported is not for a lack of effort on the part of the Government, which detained Ragbir without notice in January 2018 and sent him to Florida, where he was detained for weeks in anticipation of deporting

---

[29] As to the custodial status of a deported individual, the Supreme Court "has repeatedly held" that the writ of habeas corpus is available to aliens excluded from the United States. *Cunningham*, 371 U.S. at 239–40 (citing *Brownell v. Tom We Shung*, 352 U.S. 180, 183 (1956); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950); *United States v. Jung Ah Lung*, 124 U.S. 621, 626 (1888)). Although "in those cases each alien was free to go anywhere else in the world," "[h]is movements . . . [we]re restrained by authority of the United States, and he may by habeas corpus test the validity of his exclusion." *Id*. (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 213 (1953)) (internal quotation marks omitted).

him. Much like in *Hensley*, that process was stopped only because Ragbir was released by a writ of habeas corpus issued by the district court in January 2018 (after which the Government told Ragbir to report again on February 10, 2018). Also like in *Hensley*, Ragbir must continue to report for ICE check-ins, and he remains in this country primarily due to judicial stays of removal, including the one entered by this Court. Moreover, the Government opposed a stay of removal in the district court pending this appeal, and at oral argument, the Government could not represent to this Court that—absent a stay entered by this Court and the stay previously entered in the District of New Jersey—ICE would not deport Ragbir pending resolution of this appeal.

Thus, that Ragbir faces imminent deportation, which necessarily involves a period of detention—and that he must comply, absent judicial intervention, with the Government's orders "at any time and without a moment's notice," *Hensley*, 411 U.S. at 351—is not

63

in question. That effects a present, substantial curtailment of Ragbir's liberty. *See id*. We also cannot be confident that, if we were to wait for the Government to *again* detain Ragbir, he would have access to judicial oversight prior to being removed from the country. We thus reject employing a "stifling formalism," *id*. at 350, that would deny Ragbir a hearing of his claim in a habeas proceeding on the basis that he is not in Government custody, when the imminent, severe curtailment of his liberty is so obvious, *see Simmonds v. I.N.S.*, 326 F.3d 351, 354 (2d Cir. 2003) (concluding that alien subject to final order of removal was in federal immigration officials' custody and that if he were currently "ordered removed [but] *not* incarcerated," rather than "being held in state prison, th[at] conclusion would [have been] a simple one" (emphasis added)). [30]

---

[30] The Government contends that certain of our decisions require that Ragbir must be challenging his final order of removal in order to be in the custody of immigration officials. Not so; the cited decisions merely addressed variations of facts like those presented in *Simmonds*, in which the alien petitioner was currently being held in state detention yet argued he was also in *federal* government custody. In *Duamutef v. I.N.S.*, 386 F.3d 172 (2d Cir. 2004), the petitioner did not challenge the legality of his state detention, but sought a writ of habeas corpus to compel the

**C. Common-Law Habeas Courts Had Factfinding Authority**

The constitutionally minimum scope of habeas review also includes petitions that require factfinding. In *St. Cyr*, the Supreme Court concluded that the scope includes pure questions of law: "[E]ven assuming that the Suspension Clause protects only the writ as it existed in 1789, there is substantial evidence to support the proposition that pure questions of law like the one raised by the respondent in th[at] case could have been answered in 1789 by a common-law judge with power to issue the writ of habeas corpus." *St. Cyr*, 553 U.S. at 304–05. Ragbir's claims do not involve "pure question[s] of law" but rather require the adjudication of contested

---

federal government to hasten his deportation. 386 F.3d at 178. We ultimately did not decide whether the petitioner was in federal immigration custody. *Id.* at 178-79. And, in *Ogunwomoju v. United States*, 512 F.3d 69 (2d Cir. 2008), we decided that a petitioner in immigration detention or under an order of removal as a consequence of a state conviction was not in custody for purposes of challenging his *state* conviction under 28 U.S.C. § 2254. 512 F.3d at 70. Here, Ragbir challenges only federal immigration officials' conduct and is undisputedly not in state custody.

facts, and so, we consider whether there is "substantial evidence" to support that a common-law court in 1789 would have had the authority to issue the writ in such a case. *See id*.

The Supreme Court touched on this issue in *St. Cyr*: "At common law, '[w]hile habeas review of a court judgment was limited to the issue of the sentencing court's jurisdictional competency, an attack on an executive order could raise all issues relating to the legality of the detention.'" *Id*. at 301 n.14 (citing Note, Developments in the Law—Federal Habeas Corpus, 83 Harv. L. Rev. 1038, 1238 (1970)). And although "the early practice was not consistent," habeas courts sometimes "permitted factual inquiries when," as here, "no other opportunity [existed] for judicial review" of the petitioner's claim. Richard H. Fallon, Jr. & Daniel J. Meltzer, Habeas Corpus Jurisdiction, Substantive Rights, and the War on Terror, 120 Harv. L. Rev. 2029, 2102 (2007).[31]  That is not surprising because "common-law

---

[31] Other scholars have also noted that eighteenth-century habeas courts had authority to engage in factual inquiries, although they did so less often than they

66

habeas corpus was, above all, an adaptable remedy. Its precise application and scope changed depending upon the circumstances." *Boumediene*, 553 U.S. at 779–80 (discussing circumstances in which "the black-letter rule that prisoners could not controvert facts in the jailer's return was not followed") (citing, *inter alia*, Fallon & Meltzer, 120 Harv. L. Rev. at 2102; *Cunningham*, 371 U.S. at 243 (stating that habeas is not "a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose")).

Moreover, in 1867, the federal courts were expressly vested with factfinding authority in habeas proceedings by the Habeas Corpus Act of 1867, ch. 28, § 1, 14 Stat. 385. Of course, this is not definitive evidence of the scope of the writ in 1789, but it further supports that habeas courts in the early republic exercised factfinding

---

reviewed pure questions of law. *See, e.g.*, Neuman, 98 Colum. L. Rev. at 986. ("One of the maxims of eighteenth-century habeas corpus practice had been that . . . the facts [the custodian] alleged as justifying the detention were to be taken as true," but this "papered over exceptions [and] . . . was also qualified by a willingness to let the prisoner allege additional facts.").

authority. The Act provided that the "petitioner may deny any of the material facts set forth in the [custodian's] return, or may allege any fact to show that the detention is in contravention of the constitution or laws of the United States," and it required the habeas court to "proceed in a summary way to determine the facts of the case, by hearing testimony and the arguments of the parties interested . . . ." Habeas Corpus Act of 1867, ch. 28, § 1, 14 Stat. 385.[32]

---

[32] Factfinding provisions for federal habeas proceedings are currently set forth in 28 U.S.C. § 2243, which employs substantially similar language to that first codified in 1867; the petitioner "may, under oath, deny any of the facts set forth in the return or allege any other material facts." § 2243. "The court shall summarily hear and determine the facts, and dispose of the matter as law and justice require." *Id*. As such, "[p]etitioners in habeas corpus proceedings . . . are [presently] entitled to careful consideration and plenary processing of their claims including full opportunity for presentation of the relevant facts." *Harris*, 394 U.S. at 298–301. *See Wingo v. Wedding*, 418 U.S. 461, 468–70 (1974) ("More often than not, claims of unconstitutional detention turn upon the resolution of contested issues of fact. Accordingly, since the Judiciary Act of February 5, 1867, . . . Congress has expressly vested plenary power in the federal courts 'for taking testimony and trying the facts anew in habeas hearings'") (internal citation omitted); *Sigler v. Parker*, 396 U.S. 482, 487 n.* (1970) (Douglas *J.* dissenting) (stating that § 2243 provides no right to jury trial but permits the use of an advisory jury under certain circumstances); *U.S. ex rel. Mitchell v. Follette*, 358 F.2d 922, 928 (2d Cir. 1966) (stating that a habeas judge "may direct a hearing to determine the facts before handing down a final disposition").

In the end, we cannot rely "upon the assumption that the historical record is complete and that the common law, if properly understood, yields a definite answer to the questions before us." *Boumediene*, 553 U.S. at 752 (citing Paul D. Halliday & G. Edward White, The Suspension Clause: English Text, Imperial Contexts, and American Implications, 94 Va. L. Rev. 575, 588–93 (2008) (noting that most reports of 18th-century habeas proceedings were not printed)); *see* Fallon & Meltzer, 120 Harv. L. Rev. at 2096 ("[E]fforts to reconstruct historical practice with respect to most kinds of habeas proceedings founder quickly, for surviving records are fragmentary and practices were not consistent and shifted over time."). In that light, "substantial evidence" supports that a common-law habeas judge "could have" adjudicated a claim involving disputed issues of fact in 1789.[33] *See St. Cyr*, 533 U.S. at 304–305.

---

[33] We take care to emphasize that this not a case in which the Executive or another court has already *adjudicated* any facts regarding Ragbir's present claim, and so the district court here is not called upon to question the Executive's duly obtained factual findings. "[T]he necessary scope of habeas review in part depends upon

\* \* \*

The constitutionally required scope of the privilege of the writ of habeas corpus encompasses Ragbir's claim. Because Congress has provided no "adequate substitute" and because there has been no formal suspension of the writ, *Boumediene*, 553 U.S. at 771–72, Ragbir is entitled to a habeas corpus proceeding as to the basis for the Government's impending action to deport him.

**IV.   Summary and Considerations on Remand**

We hold that the district court improperly dismissed Ragbir's claim for lack of subject matter jurisdiction. Because that conclusion

---

the rigor of any early proceedings." *Boumediene*, 553 U.S. at 781; *see Heikkila v. Barber*, 345 U.S. 229, 235–36 (1953) (discussing that the constitutional ambit of habeas review has always entailed extensive deference to administrative factfinding, subject to "the enforcement of due process requirements"); Gerard L. Neuman, Jurisdiction and the Rule of Law After the 1996 Immigration Act, 113 Harv. L. Rev. 1963, 1968 (2000) ("[Habeas] [r]eview of [executive] fact-finding can ordinarily be precluded, [although] courts do enforce a due process requirement that factual determinations be supported by 'some evidence.'"). Moreover, in any event, the Government, in opposing the availability of habeas review, does not argue that the declarations of certain officials submitted to the district court must be accepted as true (or even given deference).

was the basis for the district court's order denying Ragbir's motion for a preliminary injunction, we vacate that order and remand to the district court.

We note that, while Ragbir states a claim in his complaint and attachments, it does not necessarily follow that even if he proves that the officials sought to remove him as a result of his First Amendment speech, he may never be removed. But, at least for the near future, the taint of the unconstitutional conduct could preclude removal. That "near future" could be the end of a typical two-year stay extension that Ragbir would plausibly have otherwise received through January 2020, or some other period.[34] We leave that

---

[34] Ragbir's plausible allegations support that, in the past, he was never denied a stay application, the shortest stay he received was approximately one year, and several of them, including the two most recent, were for two years. App'x 51. If he had received a two year administrative stay in January 2018, that would have lasted through January 2020. Judge Walker argues in dissent that it is implausible, in light of DHS's 2017 policy statement that "criminal aliens are a priority for removal," that Ragbir would have received another stay absent any retaliatory conduct by the Government. We observe, however, that Ragbir's past stay applications were approved even though the then-operative DHS policies stated, even more emphatically, that aliens convicted of aggravated felonies are categorized as the highest enforcement priority. *Compare* Memorandum from Jeh

determination to the district court on remand. However, accepting as true the record currently before us, it is plausible that—absent the Government's alleged retaliation in January 2018—Ragbir would not yet have been deported, and likely not until at least January 2020.

Our order of November 1, 2018, staying Ragbir's removal shall remain in force until our mandate issues. We direct the district court to enter a stay of Ragbir's removal following the issuance of our mandate, to continue at least until such time that the district court has

Charles Johnson, Sec'y of Dep't of Homeland Sec., *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants* (Nov. 20, 2014) at 3 (classifying as "Priority 1," the "highest priority to which enforcement resources should be directed," "aliens convicted of an offense classified as a felony in the convicting jurisdiction," as well as "aliens convicted of an 'aggravated felony'" as defined in section 101(a)(43) of the INA); Memorandum from John Morton, Director, U.S. Immigrations & Customs Enforcement, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (Mar. 2, 2011) at 1–2 (classifying as "Priority 1" "aliens convicted of crimes, with a particular emphasis on violent criminals, felons, and repeat offenders," and further prioritizing as "Level 1 offenders" "aliens convicted of 'aggravated felonies'") *with* Memorandum from John Kelly, Sec'y of Homeland Sec., *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017) at 3 ("criminal aliens are a priority for removal"). Moreover, even in the absence of a stay, Ragbir was allowed to remain in the country under a final order of removal from 2008 until 2011. Thus, it is plausible that—absent the Government's retaliation in January 2018—Ragbir would not have been deported until at least January 2020, and so habeas release delaying his deportation would remedy the ongoing effect of that retaliation.

reconsidered, consistently with this opinion, whether a stay should remain in place through adjudication of the motion for a temporary injunction or the merits of the case.

**CONCLUSION**

For the foregoing reasons, we **VACATE** the district court's order denying Plaintiffs-Appellants' motion for preliminary injunction and dismissing certain claims, and **REMAND** to the district court for proceedings not inconsistent with this opinion.

**18-1597-cv**
*Ragbir et al. v. Homan et al.*

John M. Walker, Jr., Circuit Judge, dissenting:

Although I agree with much of the reasoning in the majority opinion, because I would not remand the case for further proceedings or reach the issue of whether Ragbir's claim fits within the "outrageous" exception to § 1252(g)'s withdrawal of jurisdiction that was articulated by the Supreme Court in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 488–92 (1999) [hereinafter "*AADC*"], I respectfully dissent.

In my view, remand is not warranted because the Government's retaliation against Ragbir has ended and its taint has dissipated. Ragbir plausibly alleged that the Government's retaliation occurred on January 11, 2018 and included terminating his third administrative stay early, arresting him on the spot without prior notice, and attempting to immediately deport him by transporting him from New York City to Florida and incarcerating him there. But the taint of any retaliation ended no later than January 29, 2018, more than a year ago, when Ragbir was released from custody following the district court's grant of his habeas corpus petition. Importantly, that grant was ordered not so Ragbir could remain in the United States, but to allow him "an orderly departure" and "the freedom to say goodbye." *Ragbir v. Sessions*, No. 18-CV-236 (KBF), 2018 WL 623557, at *3 (S.D.N.Y. Jan. 29, 2018). Benefiting from litigation-prompted stays, Ragbir has yet to be removed.

Ragbir, in this proceeding, has never taken issue with the fact that he is subject to a valid removal order entered in March 2007 as a result of his felony conviction for wire fraud. Nor does he dispute that no stay prevents his removal other than the one entered by this court in this appeal. It is the stated policy of the current executive branch to "prioritize for removal . . . removable aliens who [h]ave been convicted of any criminal offense." Exec. Order. No. 13,768, 82 Fed. Reg. 8,799, 8800 (Jan. 25, 2017). *See also* U.S. DEPARTMENT OF HOMELAND SECURITY, ENFORCEMENT OF THE IMMIGRATION LAWS TO SERVE THE NATIONAL INTEREST (2017), at 3 ("criminal aliens are a priority for removal").[1] Although this has also been the stated policy of past administrations, enforcement practices on the ground can differ from administration to administration. One would have to be blind not to notice that the change of administration in January 2017 has brought with it an unremitting focus on deporting convicted felons, such as Ragbir. *See* U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, FISCAL YEAR 2018 ICE ENFORCEMENT AND REMOVAL OPERATIONS REPORT, at 14 (In fiscal year 2018, ICE "conducted 256,085 removals – the highest level since FY2014" and prioritized "public

---

[1] We may take judicial notice of written materials "[w]hen there is no dispute as to the authenticity of such materials and judicial notice is limited to law, legislative facts, or factual matters that are incontrovertible, such notice is admissible." *Oneida Indian Nation of New York v. State of N.Y.*, 691 F.2d 1070, 1086 (2d Cir. 1982).

safety threats and immigration violators, as reflected by the fact that, like in FY2017, 9 out of 10 [ICE] administrative arrests had either a criminal conviction(s), pending charge(s), were an ICE fugitive, or illegally reentered the country after previously being removed.").[2]

For the above reasons, I disagree with the majority's contention that the consequences of the Government's retaliation continue because, but for the retaliation, Ragbir would plausibly have obtained a further extension of his administrative stay from an administration that has steadfastly sought to deport him, much less another two-year extension. Under these circumstances, I see no reason for this case to continue in the district court, further impeding Ragbir's removal.[3]

I also have reservations about the majority's discussion of *AADC's* "outrageous" exception to the § 1252(g) removal of jurisdiction. As a preliminary matter, I fail to see the necessity of

---

[2] The Government has also represented to this court in a related case that "Ragbir has been issued a so-called 'bag and baggage' letter notifying him that he is to report to ICE for removal. (Dist. Ct. ECF No. 49). Thus, at this point it has been made abundantly clear to him that, once any judicial impediment to his removal has been lifted, it is substantially likely that the government will promptly effectuate his removal." Reply Memorandum for Respondents-Appellants at 5, *Ragbir v. Sessions* (2d Cir.) (No. 18-1595).

[3] Any concern by the majority that Ragbir's prompt removal now would somehow revive the previous retaliation of more than a year ago could presumably be addressed by the recusal of the officer who made the decisions in January 2018. This would enable a previously uninvolved officer to independently decide whether to enforce the March 2007 order of removal without regard to the circumstances that are alleged to have prompted the Government's actions in January 2018.

4

addressing this issue at all given the majority's conclusion that Ragbir is entitled to a habeas corpus proceeding under the Suspension Clause despite § 1252(g)'s withdrawal of jurisdiction. That he is permitted to bring a habeas proceeding would allow us to consider Ragbir's case regardless of whether the Government's conduct falls within the "outrageous" exception contemplated by *AADC*. As I read *AADC*, that exception was predicated on the assumption that habeas relief was not available or would come too late, *AADC*, 525 U.S. at 487–88, indicating that it is unnecessary to undertake this analysis if timely habeas relief *is* available.

Second, despite the majority's statement that it is not "delineat[ing] the boundaries of what constitutes an 'outrageous' claim within the meaning of *AADC*," it creates from whole cloth a five-factor balancing test to determine whether the Government's conduct was "outrageous." I am concerned that, because this test will be the standard by which future claims are evaluated, it will become an open door for evading the will of Congress in enacting § 1252(g). Considering only the "Government's discretionary prerogative" gives short shrift to the Government's significant enforcement interests and does not provide a framework for adequately considering the Government's actions in context.

Turning to the facts of this case, although the majority opinion acknowledges that Ragbir is a criminal alien subject to a valid removal

5

order, it quickly discounts this fact by arguing that Ragbir has no duty to leave the country on his own, unlike an alien who unlawfully enters and therefore is engaged in a continuing violation of law. To my mind, however, the Government's interest in removing a criminal alien, heightened when the executive branch has a stated policy of prioritizing the removal of criminal aliens, is at least as strong as the Government's interest in "bring[ing] to an end an ongoing violation of United States law" by one who has simply overstayed his visa. *AADC,* 525 U.S. at 491 (emphasis omitted).

Finally, although I agree that the complaint sufficiently alleged that the Government acted improperly when it shortened Ragbir's administrative stay, arrested him, and held him in custody in preparation for his departure, there was nothing inherently unlawful in these acts which, absent improper motive, are fully authorized when enforcing an alien's removal. I can easily imagine much more "outrageous" acts of government impropriety, such as the deliberate and unjustified use of grossly excessive force or vindictive placement in solitary confinement. Therefore, I am not at all convinced that the Government's actions against Ragbir were "outrageous" under the circumstances.

For these reasons, I respectfully dissent.